**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PATTY LYNN MARTIN,<br><br>        Plaintiff,<br><br>        v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:16-cv-01676 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF PATTY MARTIN AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Patty Lynn Martin asserts she is entitled to benefits under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny her application for benefits. Because the ALJ failed to apply the proper legal standards in evaluating the record, the decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

In June and July 2013, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 10-3 at 15) In both applications, Plaintiff alleged disability beginning August 26, 2011. (*Id.*) After the Social Security Administration denied the

---

[1] Nancy A. Berryhill is now Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant in this suit.

applications, Plaintiff requested a hearing, which was held on March 3, 2015. (*See generally* Doc. 10-4; Doc. 10-3 at 15) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on March 20, 2015. (*Id.* at 15-24) When the Appeals Council denied Plaintiff's request for review on September 7, 2016 (*id.* at 2-4), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

1 *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

2 the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

3 gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

4

5 To achieve uniform decisions, the Commissioner established a sequential five-step process for

6 evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires

7 the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of

8 alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the

9 listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had

10 the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform

11 other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider

12 testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

13 **A.    Medical Background and Opinions**

14 In December 2012, Plaintiff had an assessment at the Kern County Mental Health Department.

15 (Doc. 10-9 at 71) She described a family history of mental illness and believed she was molested by

16 her father, although she could not remember it. (*Id.*) In addition, Plaintiff said she "was raped 3 years

17 ago and never reported it to anyone." (*Id.*) Plaintiff reported "self medicating with alcohol" but said

18 she had been sober for one month and was attending AA meetings. (*Id.*) Christine Carlyon, ASW,

19 believed Plaintiff's thought process was goal-oriented, and she had good insight and judgment. (*Id.* at

20 78) Plaintiff appeared inattentive and exhibited an impaired ability to concentrate. (*Id.*) Ms. Carlyon

21 opined Plaintiff had a major depressive disorder and post-traumatic stress disorder. (*Id.* at 79, 81)

22 In January 2013, Plaintiff complained of high anxiety, racing thoughts, poor sleep, cold-sweats,

23 and flashbacks to being raped. (Doc. 10-10 at 47) Connery Lee, NP and RN, observed that Plaintiff

24 appeared anxious and depressed, and gave Plaintiff a GAF score of 45.[2] (*Id.* at 49, 53) Plaintiff

25 received anti-depression and anti-anxiety medication, and Mr. Lee told Plaintiff to return for a follow-

26

27 _____

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association,

28 *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

3

up appointment within two months.  (*Id.* at 54)

On March 20, 2013, Plaintiff was admitted to a hospital on a hold pursuant to California's Welfare and Institutions Code section 5150 as a danger to herself.  (Doc. 10-9 at 28)  She reported that she "was staying in a motel room alone where she was drinking alcohol," and after Plaintiff talked to her brother, he "called the police to go find her."  (*Id.*)  She stated she did not intend to kill herself but admitted "using alcohol to help her forget about her PTSD."  (*Id.*)  Plaintiff was diagnosed with Bipolar disorder, type I, and received medication at the hospital.  (*Id.* at 29)  She was discharged on March 26, when she showed "no evidence of suicidality, homicidality, mania or psychosis."  (*Id.* at 31)

Plaintiff visited KCMHD on April 1, 2013, "seeking services following [her] hospitalization."  (Doc. 10-10 at 40)  Plaintiff described "feeling hopeless and helpless, experiencing a loss of appetite which result[ed] in weight loss, difficulty [with] focusing and concentration and indecisiveness."  (*Id.*)  In addition, "[s]he reported severe anxiety, hyper-vigilance and exaggerated responses to perceived threats."  (*Id.*)  Stacy Lynn Kuwahara, MFT Intern, determined Plaintiff would "receive up to 12 encounters that may include medication support and individual/family counseling," and participate in group therapy.  (*Id.* at 46)

On May 30, 2013, Dr. Rossano Bangasan gave Plaintiff a "progress evaluation."  (Doc. 10-10 at 21)  He noted Plaintiff was taking Lithium Carbonate, and while her Lithium level was "within it's (sic) accepted range," Plaintiff said she "still [felt] different, kind of anxious, depressed." (*Id.*)  According to Dr. Bangasan, Plaintiff also stated she was "not experiencing any form of perceptual disturbances of late," such as suicidal or homicidal ideations.  (*Id.*)  Dr. Bangasan opined Plaintiff appeared anxious, depressed, and frustrated.  (*Id.* at 22-23)  Dr. Bangasan concluded Plaintiff had a "moderate" disability and was able to work part-time with support.  (*Id.* at 26)

Treatment notes from June 2013 indicate Plaintiff reported her sleep was "unchanged," but she did not have "any form of perceptual disturbances."  (Doc. 10-10 at 15)  Dr. Bangasan noted Plaintiff was celebrating "100 days of being clean and sober from any alcohol use."  (*Id.* at 16)  He observed that Plaintiff appeared frustrated, anxious, and euthymic, but also believed Plaintiff "look[ed] much better mood wise."  (*Id.* at 16-17)  Plaintiff's thought process was goal-oriented, coherent, and logical.

(*Id.* at 17)  Dr. Bangasan believed Plaintiff had a "[f]air response to psychopharmacotherapy," and Plaintiff was amenable to getting 3rd party assistance if she [felt]… in crisis or near [a] nervous breakdown episode."  (*Id.* at 19)  Dr. Bangasan again opined Plaintiff had a "moderate" disability and was able to perform part-time work with support.  (*Id.* at 20)

In August 2013, Dr. Bangasan noted Plaintiff reported she was "getting easily irritated [with] things, and she couldn't understand the reason why."  (Doc. 10-10 at 65)  In addition, she said she was "sensing some tremors in her hands."  (*Id.*)  Dr. Bangasan noted Plaintiff appeared frustrated, euthymic, and anxious.  (*Id.* at 67)  They discussed "the possibility that [Plaintiff] being anxious could be related to her ongoing PTSD," and Plaintiff agreed to begin taking Zoloft.  (*Id.* at 65)  Dr. Bangasan concluded Plaintiff's current disability level was "moderate." (*Id.* at 70)

Dr. Bangasan also saw Plaintiff for progress evaluations in October and December 2013.  (*See* Doc. 10-10 at 72-85)  In December, Plaintiff "denied having … tremors or shakes anymore."  (*Id.* at 78)  Dr. Bangasan noted Plaintiff again reported she was experiencing more irritability, but realized it "came from… some stressful things and situations."  (*Id.*)  Plaintiff said she did not know where she would go once her treatment plan with KCMHP ended, and she feared her psychotropic medications may be changed.  (*Id.*)  Dr. Bangasan opined Plaintiff had good insight and judgment, intact attention, and fair memory.  (*Id.* at 80)  On December 12, Dr. Bangasan again indicated Plaintiff had a moderate disability and was able to work part-time with support.  (*Id.* at 84)

In January 2014, Plaintiff visited KCMHD and reported she was taking her medication as prescribed, and she did not have any side effects.  (Doc. 10-11 at 58)  Dr. Sandy Abdelkedous noted Plaintiff's speech was normal; she had good eye contact; and her thought process was goal-oriented, coherent, and logical.  (*Id.* at 59)  Further, Plaintiff's attention and concentration was intact, with good insight and judgment.  (*Id.* at 60)  Similar findings were made through March 2014, when Plaintiff was advised to reduce the amount of Lithium she was taking because her "levels were elevated."  (*See id.* at 34, 43-44, 35-36)  In addition, each month, the notes indicated Plaintiff had a moderate disability, with which she could perform part-time work with support.  (*Id.* at 40, 48, 64)

Dr. Preston Davis reviewed the medical record and completed a mental residual functional capacity assessment on March 25, 2014.  (Doc. 10-4 at 52-54)  Dr. Davis opined Plaintiff had mental

limitations, and was "moderately limited" with the ability to understand and remember very short, simple instructions; but was not significantly limited with the ability to carry out these instructions. (*Id.* at 52-53) He opined Plaintiff was "[u]nable to remember/understand moderate[] to highly complex/ detailed instructions." (*Id.* at 53) According to Dr. Davis, Plaintiff was "[a]ble to maintain attention for two hours at a time and persist and simple tasks over eight- and forty- hour periods with normal supervision" but her "symptoms would preclude persistence at more complex tasks over time." (*Id.*)

In May 2014, Plaintiff reported that though her tremors had "decreased, they [were] not completely gone." (Doc. 10-11 at 26) Dr. Abdelkedous noted Plaintiff had "visible tremors on outstretched [upper extremities] bilaterally." (*Id.*) She observed that Plaintiff had a euthymic mood, spoke normally, made good eye contact, and her affect was appropriate. (*Id.* at 27) The following month, Plaintiff reported she continued to have tremors despite a lower dose of Lithium. (*Id.* at 18) In addition, she complained of "mood instability and lability." (*Id.*) As a result, her Lithium prescription was again increased. (*Id.* at 10)

In July 2014, Plaintiff reported a "much improved mood" after changing the Lithium dose and staggering them throughout the day. (Doc. 10-11 at 10) Although Plaintiff received propranolol to help with the tremors, she reported that she "stopped taking it after the second dose because she did not feel well on it" and it made her lightheaded. (*Id.*) Dr. Abdelkedous noted Plaintiff behaved cooperatively; and her thought process was goal-oriented, coherent, and logical. (*Id.* at 11-12) Dr. Abdelkedous believed Plaintiff's diagnosis was unchanged and that Plaintiff was able to work part time with support. (*Id.* at 16) Dr. Bangasan approved of this assessment. (*Id.*)

In August 2014, Dr. Abdelkedous found Plaintiff had an appropriate affect, cooperative behavior, and euthymic mood. (Doc. 10-11 at 3) Dr. Abdelkedous continued Plaintiff on her current levels of medication. (*Id.* at 8)

Plaintiff had a progress evaluation on November 14, 2014. (Doc. 10-14 at 49) Plaintiff reported she was "having worsening anxiety with nightmares," which caused her to wake up screaming. (*Id.*) In addition, she continued to have tremors. (*Id.*) Dr. Eugene Kim observed that Plaintiff appeared anxious with an appropriate affect. (*Id.* at 49-50) He added Prazosin to Plaintiff's medication regimen of Lithium, Seroquel and Zoloft. (*Id.* at 54) Dr. Kim opined Plaintiff's disability

was "moderate" and her prognosis was "fair," and Plaintiff was directed to return in four to six weeks. (*Id.*) Dr. Ranjit Padhy approved this assessment. (*Id.*)

On February 5, 2015, Plaintiff told Dr. Japsharan Gill that her short-temperedness and shaking decreased following a decrease in Lithium. (Doc. 10-14 at 42) However, Dr. Gill noted Plaintiff described low energy, depression, increased anxiety, "racing of mind, [and] doing more OCD things like counting." (*Id.*) Further, Plaintiff reported she continued to have nightmares. (*Id.*) Dr. Gill opined that Plaintiff appeared frustrated, anxious, depressed, and irritable. (*Id.* at 43) Further, Dr. Gill believed she was "minimally worse," but her disability remained "moderate." (*Id.* at 46-47) Dr. Gill added Lamictal and Wellbutrin to Plaintiff's psychotropic medications. (*Id.* at 47) Plaintiff was directed to return to KCMHD in two weeks. (*Id.* at 47)

Two weeks later, on February 19, Plaintiff told Dr. Gill that "her nightmares [had] decreased to once or twice since she started taking Xanax pm for nightmares." (Doc. 10-14 at 35) In addition, Plaintiff reported "her mood [was] better, she [had] noticed decreased anger outburst and [her] energy level [was] improving as well." (*Id.*) However, Dr. Gill noted that Plaintiff appeared anxious and frustrated, and opined Plaintiff had "minimally improved." (*Id.* at 36, 39) Dr. Gill increased Plaintiff's prescriptions for Lamictal and Wellbutrin. (*Id.* at 40) According to Dr. Gill, Plaintiff's prognosis was "guarded," she was directed return for a follow-up in "2 weeks or sooner if needed." (*Id.*) In addition, Dr. Gill noted Plaintiff's disability was "severe," and she could not perform work. (*Id.*) This assessment was approved by Dr. Gabriela Obrocea. (*Id.*)

Dr. Bangasan completed a "Medical Source Statement" on February 19, 2015. (Doc. 10-14 at 28) The statement indicated Dr. Bangasan was a "new physician" as of January 2015, but Plaintiff had been seen at the clinic since April 9, 2013. (*Id.* at 33) Dr. Bangasan noted Plaintiff had been diagnosed with Bipolar I disorder, and her "most recent episode [was] mixed with psychotic features." (*Id.* at 28) Dr. Bangasan indicated Plaintiff's "chronic and persistent mental illness…characterized by mood swings, depression, anxiety, and thoughtlessness," as well as emotional lability, psychomotor agitation, impaired impulse control, decreased energy, memory impairment, and sleep disturbance. (*Id.* at 29) According to Dr. Bangasan, Plaintiff had a seriously limited ability to maintain attention for two-hour segments and was "unable to meet competitive standards" with remembering work-like procedures and

short, simple instructions. (*Id.* at 30) Further, Dr. Bangasan opined Plaintiff had "no useful ability to function" with other work-related functions such as performing at a consistent pace, responding to changes, getting along with coworkers, and dealing with work stress. (*Id.* at 30-31) Dr. Bangasan noted Plaintiff had "been experiencing mood swings, depression and anxiety," and opined "her thoughtless behavior may impair her ability to interact with peers in social situations." (*Id.* at 31) He concluded Plaintiff was likely to be absent from work more than four days per month. (*Id.* at 32)

**B.     Administrative Hearing Testimony**

Plaintiff testified at a hearing before the ALJ on March 3, 2015. (Doc. 10-3 at 33) She reported that she had worked as an EMT, but stopped working in August 2011 after suffering a back injury at work. (*Id.* at 40) She said her back issue was resolved, but she believed she remained unable to work due to mental limitations. (*See id.* at 37)

She reported that she had anxiety and depression and that she was unable to concentrate. (Doc. 10-3 at 39, 41) In addition, she said she had nightmares and would "get paranoid and then … feel psychotic." (*Id.* at 47) Plaintiff stated sometimes she did not "want to see anybody" and she felt "anxious every day." (*Id.* at 48-49) According to Plaintiff, her symptoms had been that way "[f]or a long time," though "not as much" while she was still working. (*Id.* at 47) She believed her symptoms were "as serious as they [were]" on March 21, 2013— the date she was admitted to a hospital and quit drinking. (*Id.*)

Plaintiff stated she was placed on "a different [medication] regimen many times" and Drs. Gail and Bangason were "trying to find the right medicine." (Doc. 10-3 at 41-42) She testified she saw Dr. Bangason "about three times" both for medicine management and to talk about how she was doing. (*Id.* at 44) Further, Plaintiff said she went to "talk therapy" every two or four weeks, for "30 to 45 minutes" at each time. (*Id.* at 42)

Plaintiff reported her medication had recently changed, and at the time of the hearing she was taking Lithium, Xanax, Seroquel, Sythroid, and Zoloft. (Doc. 10-2 at 45-46) She said this medication caused "the shakes," and she took Zantac because her stomach was "always sick. (*Id.* at 46, 47)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

gainful activity after the alleged onset date of August 26, 2011. (Doc. 10-3 at 17) At step two, the ALJ found Plaintiff's severe impairments included: "major depressive disorder and posttraumatic stress disorder." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 18) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is capable of tasks that can be learned in less than 30 days involving no more than simple, short instructions and simple work-related decisions with few work place changes. She requires work [with] no exposure to hazardous conditions secondary to symptoms and medications; and she is capable of occasional interaction with supervisors, incidental interaction with coworkers and no interaction with [the] public.

(*Id.* at 18-19) Based upon this RFC, the ALJ concluded Plaintiff was "unable to perform any past relevant work." (*Id.* at 22) However, the ALJ also found "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.* at 23) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 24)

## DISCUSSION AND ANALYSIS

Appealing the decision to deny her application for benefits, Plaintiff asserts the ALJ erred in evaluating the medical record and rejecting the opinion of Dr. Bangasan. (Doc. 14 at 7-14) On the other hand, Defendant argues that the ALJ "properly discounted" the opinion of Dr. Bangasan, and did not commit "any reversible error." (Doc. 19 at 9, 12) (emphasis omitted)

### A.      ALJ's Evaluation of the Medical Evidence

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830.

When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Plaintiff contends the ALJ erred in rejecting opinions offered by Dr. Bangasan, a treating physician. Because Dr. Davis offered opinions that conflicted with limitations identified by Dr. Bangasan, the ALJ was required to set forth specific and legitimate reasons to support his rejection of Dr. Bangasan's opinions. *See Lester*, 81 F.3d at 830.

The ALJ explained the weight given to the opinions of Drs. Bangasan and Davis as follows:

> Dr. Bangasan first saw the claimant on January 15, 2015. Further, I find it noteworthy, that until February 19, 2015 (the date of his medical source statement), the Kern County mental health treatment records are generally identical throughout in almost every way, including a finding of "moderate disability with ability to work part time with support."… On that date, the entry was changed to "severe disability, unable to work" even though there is nothing in the records to support such a change and the claimant testified that her symptoms have been at the same level of severity since March 2013. I find the opinion of Dr. Bangasan not credible in light of the dramatic change in treatment records and the fact that he had seen her but one time before he expressed his opinion.

> I give greater weight to the opinion of Preston Davis, PhD, the Medical Consultant in this case (Exhibit 6A/11-12). While he neither treated nor examined the claimant, his opinions were more consistent with and supported by the record as a whole, his opinions are within his area of expertise and he has program knowledge. I based my RFC find on his opinion and added social restrictions to better reflect those portions of the claimant's testimony that was supported by the record.

(Doc. 10-3 at 21-22) Plaintiff contends the ALJ's reasons for rejecting the opinion of Dr. Bangasan are not supported by the record, and are not "legally sufficient reasons," as required by the Ninth Circuit. (Doc. 16 at 10-14)

### 1.     Treatment by Dr. Bangasan

As an initial matter, the ALJ rejected the opinion of Dr. Bangasan, in part, because "he had seen her but one time before he expressed his opinion." (Doc. 10-3 at 22)  Significantly, however, this finding is unsupported by the record.  As Plaintiff notes, she first saw Dr. Bangasan in 2013, and indicated Dr. Bangasan was her treating therapist in the Disability Report dated December 24, 2013. (*See* Doc. L4 at 10, citing Doc. 10-7 at 78; *see also* Doc. 10-7 at 78-79 [identifying the medication prescribed by Dr. Bangasan])  Further, the medical record contains many entries by Dr. Bangasan, including progress evaluation reports from May, June, August, October, and December 2013.  (Doc. 10-10 at 21-26, 15-20, 65-70, 72-85)  Further, Dr. Bangasan approved an assessment and treatment plan given in July 2014.  (Doc. 10-11 at 10)

Significantly, the Ninth Circuit has indicated that a physician who treats a patient only once may be considered a treating source when the physician's opinion represents both personal knowledge of a patient's condition and information communicated by other members of treating team.  *See Benton v. Barnhart*, 331 F.3d 1030, 1039 (9th Cir. 2003).  Because Dr. Bangasan both examined Plaintiff and was clearly aware of her diagnosis history (*see* Doc. 10-11 at 10; Doc. 10-14 at 28-29), his opinion may be considered that of a treating physician. (Doc. 11-14 at 20)

Even if Dr. Bangasan was an examining physician, the opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician, such as Dr. Davis.  *Pitzer*, 908 F.2d at 506.  The Ninth Circuit determined that while "'limited observation' of [a] claimant would be a reason to give less weight to an [examining physician's] opinion ... than to the opinion of a treating physician, it is not reason to give preference to the opinion of a doctor who has *never* examined the claimant."  *Lester*, 81 F.3d at 821.  However, here, the ALJ rejected the limitations identified by Dr. Bangasan in part because the ALJ erroneously believed he saw Plaintiff "but one time," while giving adopting to the opinion of Dr. Davis, who never examined Plaintiff.  (*See* Doc. 10-3 at 22)  Thus, the treatment by Dr. Bangasan—even if limited—fails to support the decision to reject the limitations identified by Dr. Bangasan.

### 2.     Treatment notes

The Ninth Circuit has determined an opinion may be rejected where there are internal

inconsistencies within a physician's reports. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999). The ALJ observed that KCMHD treatment notes consistently identified Plaintiff's disability as "moderate" with an "ability to work part-time with support" until February 2015, when Plaintiff's disability was identified as "severe." (Doc. 10-3 at 21-22) According to the ALJ, there was "nothing in the records to support such as change," and he rejected the limitations identified by Dr. Bangasan "in light of the dramatic change in treatment notes." (*Id.* at 22)

Notably, however, the ALJ also acknowledges that in November 2014, Plaintiff reported "having worsening anxiety with nightmares." (Doc. 10-3 at 21) Further, as the ALJ noted: "On February 5, 2015, she reported racing thoughts and continued nightmares. As a result, the doctor prescribed Xanax, Lamictal and Wellbutrin." (*Id.*) Though the ALJ correctly notes Plaintiff indicated her meds were "actually working" and her nightmares had decreased on February 19 (*id.*), he fails to address Dr. Gill's observations that Plaintiff was anxious and frustrated— resulting in an additional increase in her medications— and her prognosis was guarded. (Doc. 10-14 at 36, 40)

Further, the ALJ fails to explain how the limitations identified by Dr. Bangasan are, in fact, inconsistent with the treatment notes—including notes completed by other physicians such as Drs. Gill, Kim, and Abdelkedous — that repeatedly indicated Plaintiff was limited to *part-time* work, and would need support to sustain even the limited work. Accordingly, the purported inconsistency with the treatment notes fails to support the ALJ's decision to reject the limitations identified by Dr. Bangasan.

### 3. Consistency with the record

Finally, the ALJ indicates that he adopted the opinion of Dr. Preston because "his opinions were more consistent with and supported by the record as a whole" (Doc. 10-3 at 22), thereby suggesting the limitations of Dr. Bangasan were not consistent with the record.

The Ninth Circuit has determined that an ALJ may reject limitations "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). However, when an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts *and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)

(emphasis added); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). For example, an ALJ may also discount the opinion of a treating physician by identifying an examining physician's findings to the contrary and identifying the evidence that supports that finding. *See, e.g., Creech v. Colvin*, 612 F. App'x 480, 481 (9th Cir. 2015).

The ALJ failed meet this burden because he did not identify the clinical findings or the objective evidence that he believed to be conflict with the limitations identified by Dr. Bangasan. Rather, the ALJ offered only a summary of the medical record, and concluded the opinion of Dr. Davis was "more consistent" with the record than the opinion of Dr. Bangasan. However, this conclusion "does not achieve the level of specificity [that] prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). Because the ALJ failed to identify specific evidence that conflicted with the opinion of Dr. Bangasan, the ALJ erred in evaluating the medical record.

**B.    Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834.

13

The ALJ failed to identify legally sufficient reasons for rejecting the physical limitations assessed by Plaintiff's treating physician, Dr. Bangasan. Because the ALJ failed to resolve the conflicts in the record regarding Plaintiff's limitations, the matter should be remanded for the ALJ to re-evaluate the medical evidence. *See Moisa*, 367 F.3d at 886.

**CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Patty Martin and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __March 12, 2018__                    _____**/s/ Jennifer L. Thurston**_____
                                                        UNITED STATES MAGISTRATE JUDGE